IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 13-cv-02906-CMA-MJW

VANESSA STOCKMAR,

    Plaintiff,

v.

COLORADO SCHOOL OF TRADITIONAL CHINESE MEDICINE, INC.,
a Colorado corporation,

    Defendant.

---

**ORDER DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This is a gender discrimination and retaliation case in which two female Plaintiffs, Vanessa Stockmar and Tanya Carleton, former employees at the Colorado School of Traditional Chinese Medicine ("CSTCM"),[1] both allege that they were (1) the targets of sexual harassment by their CSTCM supervisor, Vladimir Dibrigida, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2; and (2) the targets of retaliatory discharge, insofar as CSTCM terminated their employment because they complained of sexual harassment, in violation of 42 U.S.C. § 2000e(a).

---

[1] CSTCM offers Masters of Science Degrees in Acupuncture and Traditional Chinese Medicine. Stockmar was CSTCM's registrar from July 2010 until May of 2011.  Carleton was CSTCM's Assistant Clinic Supervisor from August of 2006 to May of 2007, and its Academic Dean from May of 2007 to August of 2011.

Plaintiff Carleton argues that this Court should grant summary judgment against CSTCM on her retaliatory discharge claim (Doc. # 45 at 13), whereas Plaintiff Stockmar argues that this Court should grant summary judgment against CSTCM as to both her Title VII claim and her retaliation claim (Doc. # 44 at 17). The Court denies both of Plaintiffs' motions because there are disputed issues of material fact both as to whether the complained-of conduct was unwelcome and as to Defendant's motive and intent in terminating[2] Plaintiffs' employment. For the same reasons, the Court denies Defendant's Motion for Summary Judgment as to liability. However, the Court grants that portion of the Motion that requests the court to cap compensatory damages at $50,000, pursuant to 42 U.S.C. § 1981a(b)(3)(A).

## I. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998).

## II. ANALYSIS

### A. PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Title VII prohibits "discriminat[ion] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such

---

[2] As explained below, Defendant contends that Stockmar was not terminated, but rather, that she voluntarily resigned and CSTCM accepted her resignation (albeit, before she actually wanted to leave her job). (Doc. # 46-1 at ¶ 13.)

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986), the United States Supreme Court held that a plaintiff may establish a Title VII violation by proving that discrimination based on sex created a "hostile or abusive work environment."  To survive summary judgment on this claim, a plaintiff must show that: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment; and (5) a basis for employer liability.  *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007).

Title VII also "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)).  To establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) the employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action.  *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1267 (10th Cir. 2005).

Regarding Plaintiff Carleton's Motion, Defendant contends that a genuine issue of material fact – i.e., whether the requisite "causal connection" exists between Carleton's filing of an EEOC charge and her termination – precludes summary judgment

on her retaliation claim. Specifically, Defendant points to the deposition testimony of Mark Manton, CSTCM's chief executive officer and the individual who terminated Carleton. Manton testified that Carleton's termination was not motivated by her filing of an EEOC claim but rather because she was an "uncooperative" employee. (Doc. # 47 at 5.) Although the jury may ultimately conclude that Mr. Manton's explanation is not credible, questions regarding an employer's motive and intent in making an employment decision are "particularly inappropriate" for summary judgment disposition. *See Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) (internal citation omitted) ("If the plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive . . . it is for the trier of fact to decide which story is to be believed"). Accordingly, the Court DENIES Plaintiff Carleton's Motion.

As for Plaintiff Stockmar's Motion, Defendant contends that the Court should not grant summary judgment because DiBrigida's conduct was not "unwelcome." In support of this argument, Defendant points to DiBrigida's deposition testimony, stating that Stockmar engaged in sexual joking and banter with him and that "everything was consensual."[3] (Doc. # 72-1 at 2-3.)[4] Meanwhile, Stockmar has submitted evidence

---

[3] Defendant also submits evidence from a written statement composed by Alexis DiBrigida, DiBrigida's daughter, regarding events which occurred at a December 2010 holiday party held at Plaintiff Carleton's home. (Doc. # 72 at 3.) Specifically, Ms. DiBrigida claims that Stockmar acted in a flirtatious manner toward DiBrigida. (*Id*.) Plaintiffs have filed a Motion in Limine to exclude evidence regarding this 2010 holiday party on the basis that it is irrelevant and prejudicial. (Doc. # 77.) Given the other evidence disputing whether DiBrigida's conduct was "unwelcome," the Court not need to consider this evidence (or this issue) in resolving the instant Motions.

[4] Defendant's Motion characterizes Stockmar's conduct at the December 2010 holiday dinner as "despicable." (Doc. # 72 at 5.) Such ad hominem attacks are both unprofessional and unhelpful to the Court.

indicating DiBrigida's conduct was, in fact, unwelcome.  (Doc. # 44 at 2-4, Doc. # 44-5 at ¶¶ 5, 9-10, Doc. # 47-1 at 22:10-25, 23:1-2.)  Whether DiBrigida's conduct was "welcome" inevitably requires evaluations of both DiBrigida's and Stockmar's credibility, evaluations which must be made by the jury – not the Court.  *See Randle*, 69 F.3d at 453.  Similarly, although Stockmar claims that she was terminated in retaliation for reporting sexual harassment, Manton claims that she was not terminated, but rather, that she resigned, because "she was quitting and moving to Virginia." (Doc. # 46-1 at ¶ 13); *see also* (Doc. # 44-10) (a letter from Manton to Stockmar, stating that "Your attorney Mr. Schaefer's letter dated May 19, 2011 asserts you were 'constructively discharged' and have been forced to leave.  That is untrue.  Mr. Schaefer states you would be leaving CSTCM 'soon.'  It is in our mutual best interest to sever CSTCM'S relationship with you now.  In CSTCM's view you have quit your employment here.")  Stockmar denies telling Manton that she was resigning or moving to Virginia.  (Doc. # 47-1 at 52:19-25, 53:1-10.)  Thus, a genuine issue of material fact remains as to a) whether Stockmar was terminated or actually resigned; and b) if she was terminated, whether CSTCM did so because she engaged in a protected activity, namely, reporting sexual harassment.  Accordingly, Plaintiff Stockmar's Motion is also DENIED.

B.  **DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant's Cross-Motion contends that Defendant is entitled to summary judgment regarding CSTCM's liability because (1) DiBrigida's conduct was not "unwelcome"; and (2) CSTCM should prevail on what is known as the *Faragher/Ellerth* defense.  (Doc. # 46.)  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998);

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  That affirmative defense is available to an employer only when there has been no "tangible employment action" against an employee.  *Ellerth*, 524 at 761-62.  An employer pleading the defense must demonstrate that (1) the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  *Id*. at 765.  In the alternative, Defendant's Motion contends that, even if Defendant is ultimately held liable, compensatory damages should be capped at $50,000 per Plaintiff, pursuant to 42 U.S.C. § 1981a.

As explained above, the question of whether DiBrigida's conduct was "welcome" is highly disputed here, and accordingly must be resolved by the jury.

Moreover, because Plaintiffs' allegations of sexual harassment "culminated" in adverse employment actions, the *Faragher/Ellerth* defense is not available to CSTCM.  *See Ellerth*, 524 at 761-62.  In *Helm v. Kansas*, 656 F.3d 1277, 1287 (10th Cir. 2011), the Tenth Circuit held that, to demonstrate that the harassment "culminated" in the adverse action, a plaintiff must establish a "strong causal nexus between the supervisor's harassment and the tangible employment action."  In applying this standard, that court also held that no reasonable juror could find that the plaintiff's termination in that case was causally connected to the harassment she experienced, because her direct supervisor (against whom she had complained regarding harassment) had removed himself from any employment decisions, and there was no other evidence to connect the reporting of the alleged harassment of her direct

6

supervisor with her termination (which occurred after she was arrested and charged with a felony and two misdemeanors preventing her from performing her work). *Id.* In this case, because Manton, not DiBrigida, actually fired Stockmar and Carleton, both Plaintiffs must connect DiBrigida's harassing conduct to their terminations (by Manton) in order to bar application of the *Faragher/Ellerth* defense.[5]

Here, Plaintiffs have submitted sufficient evidence for the Court to conclude that that their reporting harassment or filing a charge of discrimination with the EEOC based on DiBrigida's conduct "culminated" in adverse employment actions against them. Unlike in *Hall*, there is no evidence indicating that DeBrigida was entirely removed from either Plaintiffs' employment decisions; instead, the record indicates that DeBrigida's conduct was very much related to the Plaintiffs' separations from employment.

In particular, Stockmar alleges that on May 19, 2011, she informed Manton that she had obtained legal representation and was filing a charge with the EEOC. (Doc. # 6 at ¶¶ 27). Merely six days later, on May 27, 2011, she received two letters – one indicating that "CSTCM is currently conducting an outside investigation of Ms. Stockmar's allegations," which "should conclude by about June 10, 2011," and another from Mr. Manton, which made no reference to Stockmar's purported move to Virginia and stated in relevant part that

> I regret to inform you your last day here at the School is Friday May 27,

---

[5] Because DiBrigida was Carleton and Stockmar's supervisor, and DiBrigida himself was supervised by Manton, *see* (Doc. # 45-4), Defendant's liability would seemingly be premised on a slightly modified version of the so-called "rubber stamp" or "cat's paw" theories, which "refer[ ] to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *E.E.O.C. v. BCI Coca–Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006).

> 2011. . . . I and the CSTCM board are very upset by this matter. If any of your material allegations against Vladimir [DiBrigida] are found to be true, the School offers its profound apologies to you . . . Your attorney Mr. Schaefer's letter dated May 19, 2011 asserts you were 'constructively discharged' and have been forced to leave. That is untrue. Mr. Schaefer states you would be leaving CSTCM 'soon.' **It is in our mutual best interest to sever CSTCM'S relationship with you now.** In CSTCM's view you have quit your employment here.

(Doc. # 44-10) (emphasis added). Although the jury may well credit Manton's account that he was not motivated to discharge Stanton to retaliate against her, but merely was allowing her to resign of her own accord, this letter shows that CSTCM at least **accelerated the end of Stockmar's employment** – i.e., the equivalent of termination – because the school was "very upset" about her complaints. See Ellerth, 524 U.S. at 760-61 (internal quotation omitted) ("If the plaintiff can show that she suffered an economic injury from her supervisor's actions, the employer becomes strictly liable without any further showing.")

Manton does not contest that he terminated Carleton, but explains that he did so because she was an "uncooperative" employee, not because she filed an EEOC claim or complained about alleged sexual harassment. (Doc. # 47 at 5). However, other evidence disputes this account, and indicates that Manton believed Carleton was being "uncooperative" **precisely because** she complained about sexual harassment. On August 23, 2011, Carleton received a letter stating, in relevant part that

> You have alleged that you have been sexually harassed by Vladimir DiBrigida, another employee of the school . . . Your allegations are untrue. . . . Recently, your lawyer demanded $112,000 on behalf from the School. This is absurd. The school has done nothing wrong here and I have done everything humanly possible to restore a professional workplace here and keep you employed. Your refusal to cooperate with our efforts to have a mediator work on resolution with you and Vladimir through a series of

> private and joint meetings and your ongoing hostile, defensive and difficult attitude towards Vladimir and the Board has defeated any hopes of meaningful progress. You have put the School in an impossible situation, all driven by your greed for money. Bottom line, the School is not going to employ you and pay you so you can launch frivolous and expensive legal proceedings against us and try (as you have been doing these past few months) to bolster your legal claims against the School. This is highly disloyal and the school is not going to tolerate it further. Indeed, it is blackmail. You will receive no severance pay. You don't deserve it.

(Doc. # 44-12.) Additionally, CSTCM's response to Carleton's EEOC charge states that Carleton's "**employment ended when she decided to sue the school** and refused to cooperate with resolving the problems . . . the school made every attempt to resolve the issue, however Ms. Carleton made it impossible to do so, she refused resolution and instead retained a lawyer and demanded a huge settlement from a school." (Doc. # 45-12 at 2) (emphasis added).

Manton's letters, as well as CSTCM's response to Carleton's EEOC charge, explicitly reference Plaintiffs' complaints of sexual harassment against DiBrigida (and the fact that Plaintiffs hired lawyers to represent them against the company) in the context of explaining the reasons for their separation from CSTCM employment. Although neither the letters nor the response to the EEOC charge outright state that the Plaintiffs were terminated "**because of** their complaints of sexual harassment," they are sufficient evidence that DiBrigida's conduct was connected to the end of Plaintiffs' employment with CSTCM. Consequently, DiBrigida's harassing conduct "culminated" in an adverse employment action, such that the *Faragher/Ellerth* defense is unavailable. As such, Defendant's Motion for Summary Judgment on the issue of liability is DENIED.

9

Defendant's Motion also argues that CSTCM's compensatory damages should be capped at $50,000, pursuant to 42 U.S.C. § 1981a(b)(3)(A). That statute provides that compensatory damages shall not exceed $50,000 "for each complaining party . . . in the case of a[n] [employer] who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 1981a(b)(3)(A). In support of this argument, Defendant submitted a declaration from Manton stating that CSTCM "has never had more than 100 employees in it's [sic] over 25 years of existence." (Doc. # 46-1 at ¶ 6.) Plaintiffs offer no affirmative evidence in rebuttal; instead, they argue that CSTCM has inadequately supported its argument with Manton's bare say-so. (Doc. # 56 at 6-7.) However, Defendant provided additional evidence in its Reply brief in support of its Motion; specifically, Defendant provided a copy of CTSCM's Colorado State Unemployment Insurance Tax Reports that show that the number of "covered workers who worked or received pay for the payroll" varied during the course of Plaintiffs' tenure with CSTCM, but the highest number of employees working or receiving pay was 66. (Doc. # 75-2 at 27, 29, 30.) Because Plaintiffs have submitted no evidence to indicate that CSTCM had more than 100 employees, and Defendant has submitted competent evidence indicating that CSTCM never employed more than 66 individuals, the Court GRANTS Defendant's Motion in part and holds that the $50,000 compensatory damage limitation of 42 U.S.C. § 1981a(b)(3)(A) is applicable in this case.[6]

---

[6] Defendant's Motion argues that "Each Plaintiff's **damage claim** is 'capped' at $50,000." (Doc. # 46 at 5) (emphasis added). To minimize confusion, the Court emphasizes that, assuming CSTCM is found liable, the Plaintiffs' **compensatory** damages would be capped at $50,000, but

10

### III. **CONCLUSION**

Accordingly, the Court ORDERS that Plaintiffs' Motions for partial summary judgment (Doc. ## 44, 45) are DENIED. It is

FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment (Doc. # 46) is GRANTED in part and DENIED as to the remainder.

DATED: January 19, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

their back pay or front pay damages would not be. *See* 42 U.S.C. § 1981b(2) (emphasis added) (stating that "[c]ompensatory damages awarded under this section **shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g)** of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000e–5(g)]."); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848 (2001) (holding that front pay is not an element of compensatory damages within the meaning of § 1981a, and, therefore, that the statutory cap of § 1981a(b)(3) is inapplicable to front pay).