IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Christine M. Arguello**

Civil Action No. 13-cv-02906-CMA-MJW

VANESSA STOCKMAR,

     Plaintiff,

v.

COLORADO SCHOOL OF TRADITIONAL CHINESE MEDICINE, INC.,
a Colorado corporation,

     Defendant.

_____

**ORDER DENYING DEFENDANT'S MOTION TO SET ASIDE PUNITIVE DAMAGE
AWARDS OR, IN THE ALTERNATIVE, FOR REMITTITUR**
_____

This employment discrimination and retaliation case was brought by Vanessa

Stockmar and Tanya Carleton, former employees at the Colorado School of Traditional

Chinese Medicine ("CSTCM").[1]  Both Plaintiffs alleged that they (1) were sexually

harassed by their CSTCM supervisor, Vladimir DiBrigida, and (2) were the targets of

retaliatory discharge by CSTCM.  The case was tried to a jury between February 23 and

February 27, 2015.  On February 27, 2015, the jury returned a verdict in Plaintiffs' favor,

awarding each Plaintiff the same amount:  $1.00 in back pay, $1.00 in compensatory

damages, and $50,000 in punitive damages.  (Doc. ## 100, 101.)

_____

[1] CSTCM offers Masters of Science Degrees in Acupuncture and Traditional Chinese Medicine. Stockmar was CSTCM's registrar from July 2010 until May of 2011.  Carleton was CSTCM's Assistant Clinic Supervisor from August of 2006 to May of 2007, and its Academic Dean from May of 2007 to August of 2011.

This matter is before the Court on Defendant's Motion to Set Aside Punitive Damages Awards, or, in the Alternative, for Remittitur.  (Doc. # 118.)  Because there was sufficient evidence warranting the jury's imposition of punitive damages, and because remittitur is not justified, the Court denies Defendant's Motion, as explained below.

## I.   STANDARD OF REVIEW

A party challenging a jury's verdict, particularly a jury's damages determination, bears a heavy burden:

> It is a fundamental legal principle that the determination of the quantum of damages in civil cases is a fact-finder's function.  The trier of the facts, who has the first-hand[] opportunity to hear the testimony and to observe the demeanor of the witnesses, is clothed with a wide latitude and discretion in fixing damages, pursuant to the court's instructions, deemed proper to fairly compensate the injured party.

*Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985).  As such, "[w]here a new trial motion asserts that the jury verdict is not supported by the evidence, the verdict must stand unless it is **clearly, decidedly, or overwhelmingly** against the weight of the evidence."  *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1284 (10th Cir. 1999) (emphasis added, internal quotations and citations omitted).   A verdict must be supported by substantial evidence, *Wulf v. City of Wichita*, 883 F.2d 842, 874 (10th Cir. 1989), but can be based on "any competent evidence tending to sustain it," *Bennett,* 774 F.2d at 1028.  Additionally,  the Court views the evidence in the light most favorable to the prevailing party, *Anaeme*, 164 F.3d at 1284, bearing in mind that the jury "has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the

evidence, and reaching ultimate conclusions of fact ." *Snyder v. City of Moab*, 354 F.3d 1179, 1188 (10th Cir. 2003) (internal quotations and citations omitted).

Remittitur, which permits a court to reduce a damages award, is rarely appropriate. Specifically, the jury's verdict is "inviolate" unless it is "so excessive that it shocks the judicial conscience and raises an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *M.D. Mark, Inc. v. Kerr–McGee Corp.*, 565 F.3d 753, 766 (10th Cir. 2009).

## II.  ANALYSIS

### A.  SUFFICIENCY OF THE EVIDENCE

To recover punitive damages under Title VII, a plaintiff must show that an employer engaged in discriminatory practices with malice or with reckless indifference to her federally protected rights. *Harsco Corp. v. Renner*, 475 F.3d 1179, 1189 (10th Cir. 2007). "Malice" or "reckless indifference" do not require "a showing of egregious or outrageous" conduct, but rather, evidence that the employer acted "in the face of a perceived risk that its actions [would] violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36 (1999).

An employer may not be held **vicariously** liable for punitive damages, however, if a managerial employee's actions in perpetrating sexual harassment were contrary to the employer's good-faith efforts to comply with Title VII. *Id.* at 545–46; *see also Deters v. Equifax Credit Info. Servs.*, 202 F.3d 1262, 1271 (10th Cir. 2000) (explaining that "vicarious liability applies to situations in which a supervisor perpetrates harassment himself, whereas a theory of direct liability is more appropriate where an employer fails

3

to respond adequately to harassment of which a management-level employee knew or should have known.")  To avail itself of the good-faith standard in defending against vicarious liability, an employer must, "at least": (1) adopt anti-discrimination policies; (2) make a good faith effort to educate its employees about these policies and the statutory prohibitions; and (3) make good faith efforts to enforce its anti-discrimination policies. *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000).

Defendant first argues that there was insufficient evidence to support the jury's punitive damages award because Plaintiffs presented "[n]o evidence that Defendant knew about or ratified DiBrigida's acts."[2]  (Doc. # 118 at 3.)  This assertion is plainly contradicted by the trial record.  "Actual knowledge will be demonstrable in most cases where the plaintiff has reported harassment to management-level employees."  *Adler v. Wal-Mart Stores*, Inc., 144 F.3d 664, 673 (10th Cir. 1998); *see also Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1270-71 (10th Cir. 2000) ("When a company specifically designates a particular employee within the company as a final person responsible for enforcing that company's policy against discrimination, then by the company's own designation, information provided to such an employee is knowledge to the company.")  In the instant case, Plaintiffs testified that they complained to Mr. DiBrigida about his own conduct; the trial evidence established that Mr. DiBrigida was

---

[2] CSTCM also asserts that this Court "**held** that the alleged harasser (DiBrigida) duped a decision maker (Manton) into taking an adverse action," thereby implying that CSTCM did not know about DiBrigida's conduct.  (Doc. # 118 at 3) (emphasis added).  However, the Court made no such "holding"; rather, the Court decided that Plaintiffs submitted sufficient evidence **on summary judgment** regarding an entirely different issue, that is, whether Plaintiffs' reporting of harassment or filing a charge of discrimination with the EEOC "culminated" in adverse employment actions taken against them by CSTCM.   (Doc. # 81.)

4

the individual to whom CSTCM designated responsibility for its HR policies, including those involving sexual harassment.  Plaintiffs also testified that they brought complaints about Mr. DiBrigida's behavior to several management-level employees on multiple occasions.  Specifically, Ms. Carleton testified that she complained to CSTCM's CEO, Mark Manton, and its President, George Kitchie.  Additionally, Mr. Kitchie personally witnessed Mr. DiBrigida's problematic conduct; for example, he testified that both he and Ms. Carleton received an "inappropriate" email from Mr. DiBrigida containing a photograph of a nude woman jumping on a trampoline.  Similarly, Ms. Stockmar testified that she complained about Mr. DiBrigida's conduct to one of the CSTCM's Board of Directors, Yan Yun Wang.  Further, Mr. Manton testified that Ms. Wang notified him about Ms. Stockmar's complaints, and also that Ms. Stockmar complained to him directly.  These actions were certainly enough to demonstrate CSTCM's actual knowledge of Plaintiff's complaints.

Indeed, at the same time Defendant argues that CSTCM had no knowledge of Plaintiffs' complaints, it simultaneously argues that it responded to them "promptly," pointing to, for example, the fact that it brought in an outside investigator, hired a firm to conduct on-site training of employees, and offered free counseling to both Plaintiffs. (Doc. # 118 at 4.)  However, even if an employer "adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." *Cadena*, 224 F.3d at 1210 (emphasis added).

Additionally, the good-faith defense does not apply in cases involving direct liability; specifically, it is "negated by a showing of direct malice or reckless indifference to federally protected rights of [a plaintiff] by [a management level employee] who was designated by the company as a final decision-making authority responsible for implementing the company anti-discrimination policy." *Deters*, 202 F.3d at 1271.

In the instant case, not only was there sufficient evidence for the jury to conclude that CSTCM **lacked** a strong non-discrimination policy "on paper," but also that CTSCM management was recklessly indifferent to Plaintiffs' federally protected rights. For example, Plaintiffs presented evidence that CTSCM's employment handbook did not contain a policy specifically pertaining to "sexual harassment," nor procedures for reporting such harassment; indeed, even as trial, the handbook had still not been updated. Additionally, CSTCM employees never received training of any kind about sexual harassment prior to receiving notice of Plaintiffs' complaints. Even more significantly, Plaintiffs presented evidence that CSTCM failed to take their complaints seriously once they were brought to management's attention. For instance, both Plaintiffs testified about the significant delays between when they complained and when CSTCM finally acted in response to those complaints. Although CSTCM suspended Mr. DiBrigida for two weeks (one week with pay, one without), it returned him to the same position, and did not actually reprimand him at any point. The evidence also indicated that Ms. Carleton pled with Mr. Manton to remove Mr. DiBrigida as her supervisor, but that he refused, and also that, upon terminating her, he characterized her complaints of sexual harassment as "blackmail" against CSTCM. In fact, Mr. Manton went so far as to

admit at trial that "one" of the reasons he terminated Ms. Carleton was because she

brought legal proceedings against the school.  As for Stockmar, she was informed by

Mr. Manton that the school was "very upset" by her complaints, and it terminated her

employment at the same time it was purportedly investigating Mr. DiBrigida's behavior.

In sum, evaluating the evidence in the light most favorable to the Plaintiff, there

was a sufficient basis for the jury to conclude that CSTCM acted "in the face of a

perceived risk that its actions [would] violate federal law," and accordingly, to award

punitive damages to Plaintiffs.  *See Kolstad,* 527 U.S. at 535–36.[3]

## B.  REMITTITUR

In evaluating a motion for remittitur, the Court must view all facts in the light

most favorable to the prevailing party.  *Patton v. TIC United Corp.*, 77 F.3d 1235, 1242

(10th Cir. 1996).  "A trial judge should not order a remittitur or a new trial when the size

of the verdict turns upon conflicting evidence and the credibility of witnesses."  *Palmer v.*

*City of Monticello*, 31 F.3d 1499, 1508 (10th Cir. 1994).

Defendant argues that the jury's punitive damages award was so excessive as to

violate CSTCM's constitutional right to the due process of law.[4]  In evaluating the

reasonableness of a punitive damages award, courts consider three guideposts: (1) the

degree of reprehensibility of the defendant's misconduct; (2) the disparity between the

actual or potential harm suffered by the plaintiff and the punitive damages award; and

[3] Defendant also asserts that "the jury verdict was not signed, even though the verdict form requires signature.  This Court must decide whether that may affect the jury's verdict *in toto.*" (Doc. # 118 at 1.)  The jury verdict was, in fact, signed; however, the publically filed jury verdict is redacted to protect juror's identifying information.  (Doc. # 102, 103.)

[4] CSTCM has not challenged the jury instructions pertaining to damages.

(3) the difference between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases.  *State Farm Mut. Auto. Ins. Co.*

*v. Campbell*, 538 U.S. 408, 418 (2003).  Additionally, in analyzing a punitive damages

award for excessiveness, the Court must consider the goal of deterrence.  *Deters v.*

*Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1272 (10th Cir. 2000).  "Only when an

award can fairly be categorized as 'grossly excessive' . . . does it enter the zone of

arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996).[5]

As for the degree of reprehensibility – "the most important indicium of the

reasonableness of a punitive damages award," *Gore*, 517 U.S. at 576 – courts generally

consider the financial vulnerability of the plaintiff, whether the harm was physical as

opposed to economic, whether the defendant acted with indifference or a reckless

disregard for the health and safety of others, and whether the harm was the result of

---

[5] Plaintiffs cite the Ninth Circuit's recent *en banc* decision in *Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014), holding that a "rigid application" of the guideposts outlined in *Gore* and *State Farm* is less "necessary or appropriate" in the Title VII context. *Id*. at 1056.  In *ASARCO*, a hostile work environment and retaliation case, the defendant argued that a jury's award of $300,000 in punitive damages was excessive in light of the jury's award of $1 award in nominal damages. *Id.* at 1053–54. The court disagreed, and discussed how Title VII – in capping damages and in clearly setting forth the required conduct and mindset for a defendant to be found liable for punitive damages – effectively addresses "*Gore*'s concern that defendants be on notice of what conduct might make them liable for punitive damages and the extent to which they might be held liable." *Id.* at 1056–57.  Although the Tenth Circuit has not made a similar determination regarding the applicability of the *Gore* and *State Farm* factors in the employment discrimination context in particular, it bears mention that the circuit has also acknowledged problems with their rigid application and made similar arguments about how "the plain language of Title VII itself" provides notice to employers that it could be subject to punitive damages. *See, e.g., Deters*, 202 F.3d at 1273 (internal citations omitted) (upholding $295,000 punitive damages award in sexual harassment case and discussing the limits of "firm ratios" and the *Gore* analysis "if a particularly egregious act has resulted in a small amount of economic damages" and "where the injury is primarily personal.")

intentional malice, trickery or deceit. *State Farm*, 538 U.S. at 419.  In the instant case,

Defendant argues that its conduct was not reprehensible because "there was no

evidence of physical harm to either Plaintiff nor was there evidence of Defendant's

indifference to or reckless disregard for the health and safety of other employees," and

asserts that the Plaintiffs' "emotional distress is not physical harm."  (Doc. # 118 at 5.)

However, a plaintiff is not required to produce evidence of physical abuse or contact to

establish a hostile work environment claim.  *See Meritor Sav. Bank, FSB v. Vinson,* 477

U.S. 57, 65 (1986) (sexual harassment includes "verbal or physical conduct of a sexual

nature"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–23 (1993) (gender-based insults

and unwanted sexual innuendoes can be sufficient to constitute a hostile work

environment without proof of concrete physiological injury).  Moreover, the evidence

indicated that Mr. DiBrigida's conduct caused Plaintiffs emotional distress with physical

manifestations: Ms. Carleton testified that she could not sleep and suffered extreme

anxiety and depression, and Ms. Stockmar testified that she became physically ill,

suffered extreme anxiety, and experienced significant weight gain.  Additionally, as

discussed above, Plaintiffs presented evidence indicating that Mr. DiBrigida's

inappropriate conduct was far from an isolated event, that CSTCM failed to take their

complaints seriously or to take immediate and appropriate corrective action, and that it

retaliated against them by firing them after they complained.  Reviewing the facts in the

light most favorable to the Plaintiffs, as the Court must, *see Anaeme*, 164 F.3d at 1284,

a jury was entitled to decide that CSTCM's behavior was reprehensible.

With regard to the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award, Defendant argues that the ratio between punitive and compensatory damages here (50,000 to 1) is excessive. However, the Tenth Circuit has indicated that "firm ratios are most applicable to purely economic injury cases where injury is not hard to detect," and also that "low awards of compensatory damages may support a higher ratio if a particularly egregious act has resulted in a small amount of economic damages." *Deters*, 202 F.3d at 1273. Moreover, in cases where the injury is primarily personal, "a greater ratio may be appropriate." *Id.* All of these factors apply here: this case involved a personal, not a purely economic injury, which resulted in a small amount of economic damages. As such, the Court is not persuaded that the ratio between compensatory and punitive damages in the instant case is unconstitutionally disproportionate.

As for the third guidepost – the different between the award at issue and civil sanctions authorized or imposed for comparable misconduct – Title VII caps compensatory damages against employers with more than 14 and fewer than 101 employees at $50,000. 42 U.S.C. § 1981a(b)(3)(A). The maximum award for comparable cases is therefore $50,000 in civil penalties. Pointing to the damages cap, CSTCM asserts that the Court must reduce the punitive damages award here because "Plaintiffs have not presented evidence of conduct that warrants imposition of the maximum penalty available." (Doc. # 118 at 6.) However, this argument is premised on the Court choosing Defendant's version of the facts, rather than the jury's. *See Deters*, 202 F.3d at 1272 ("[Defendant] argues that it could not have anticipated that it

10

would be exposed to the statutory maximum for damages, given what occurred here

. . . [this] argument relies on our accepting [defendant's] rendering of the facts, rather

than following our standard of review, reviewing the facts in the light most favorable to

the prevailing party"); *see also Palmer*, 31 F.3d at 1508 ("A trial judge should not order a

remittitur or a new trial when the size of the verdict turns upon conflicting evidence and

the credibility of witnesses.")  In any event, it is clear that CSTCM misconstrues the

purposes of Title VII's damages cap:

> Section 1981a establishes a regime whereby the jury will set the
> damages, without reference to the statutory cap. Then, if the damages
> awarded exceed the relevant limit, the district court shall reduce the
> amount so that it conforms to the statutory cap. **The statutory cap is not
> the limit of a damages spectrum,** within which the judge might
> recalibrate the award given by the jury.  To treat it as such would be to
> invade the province of the jury, something explicitly contrary to the
> purposes of 1981a.

*Deters,* 202 F.3d at 1272 (emphasis added) (citing *Luciano v. Olsten Corp.*, 110 F.3d

210, 221 (2d Cir. 1997)) ("The legislative history of the provision confirms that it is not

meant to exert upward or downward pressure on the size of jury awards.")  As such,

only where an award "shock[s] the judicial conscience, and constitute a denial of

justice," will it be reduced below the statutory cap.  *Id.* (internal quotation marks

omitted).  The Court finds neither condition satisfied here, and will respect the jury's

within-reason determination of what level of damages would punish CSTCM based on

its review of the evidence.  *See Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672,

678 (7th Cir. 2003) ("The judicial function is to police a range, not a point."); *Lampley v.

Onyx Acceptance Corp.*, 340 F.3d 478, 486 (7th Cir. 2003) (internal citation omitted)

("because Title VII cases are so fact-specific, 'we will not normally disturb an award of

damages in a Title VII case at or under the statutory cap, as this decision is largely

within the province of the jury.'")

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Set Aside Punitive Damages

Awards, or, in the Alternative, for Remittitur (Doc. # 118) is DENIED.

DATED:  June 8, 2015

BY THE COURT:

Christine M Arguello

_____
CHRISTINE M. ARGUELLO
United States District Judge

12